UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

DAVID LAU, et al.,

               Plaintiffs,

   -against-

ZTE CORP., ZTE (USA) INC., ZTE (TX) INC.,
HUAWEI TECHNOLOGIES CO., LTD.,
HUAWEI TECHNOLOGIES USA INC.,
FUTUREWEI TECHNOLOGIES, INC., and
SKYCOM TECH CO. LTD.,

               Defendants.

-------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
22-cv-1855 (CBA)

**AMON, United States District Judge:**

Plaintiffs are a group of American citizens killed or injured by terrorist attacks in Afghanistan between 2012 and 2017, or their families. Plaintiffs filed this action against several telecommunications companies, seeking damages pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). A subset of the captioned defendants now move to dismiss Plaintiffs' Amended Complaint: ZTE (USA) Inc., and ZTE (TX) Inc. ("ZTE" or the "ZTE U.S. Defendants"); and Huawei Technologies USA Inc., Huawei Device USA Inc., and Futurewei Technologies, Inc. ("Huawei" or the "Huawei U.S. Defendants") (collectively, "Defendants").[1] Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), for lack of personal jurisdiction, and 12(b)(6), for failure to state a claim.

For the reasons that follow, Defendants' motions to dismiss are GRANTED.

-------

[1] The defendants here differ only slightly from a related case before me, Zobay v. MTN Group Ltd., No. 21-cv-3503 ("Zobay"). The Lau Plaintiffs have not named MTN Group Limited ("MTN") or any of its affiliates as defendants. Plaintiffs do, however, include MTN as a co-conspirator and devote a substantial portion of their complaint to its conduct. Huawei suggests that Plaintiffs did not name MTN as a defendant "because approximately 75% of them are bringing similar claims against MTN in a different forum." (ECF Docket Entry ("D.E.") # 54 ("Huawei Br.") 1 n.1 (citing Cabrera v. Black & Veatch Special Projects Corps., No. 19-cv-3833 (D.D.C. filed Dec. 27, 2019).)

## SUMMARY OF COMPLAINT[2]

The facts in this case substantially mirror the facts in Zobay. Other than the section relating to the Lau Plaintiffs, approximately 83% of the allegations in the Amended Complaint are materially identical—often verbatim—to the allegations in Zobay. (See Huawei Br. 1.) Accordingly, I refer the parties to the facts as set forth in my September 28, 2023 Memorandum and Order, Zobay, D.E. # 129 ("Zobay M&O"), except as to the facts specific to Lau set forth below.

Plaintiffs or their family members were injured in a series of 64 terror attacks (the "Attacks") in Afghanistan between 2012 and 2017. (D.E. # 41 ("AC" or "Amended Complaint") ¶ 1.) The Attacks were committed by a "Syndicate" made up of al-Qaeda, the Taliban, the Haqqani Network, Lashkar-e-Taiba, and Jaysh-e-Mohammed. (Id. ¶¶ 1077-82.) Each Attack was allegedly planned or authorized by al-Qaeda, a Foreign Terrorist Organization ("FTO") at all relevant times. (See id. ¶¶ 1042-76, 1082.) The Lau Plaintiffs differ in certain respects from the Zobay plaintiffs. First, here, four Plaintiffs are not U.S. nationals, but their family member who was injured or killed in the Attacks was. (Id. at Ex B (full list of Plaintiffs, their nationality, and relationship to the injured person).) Second, no Plaintiffs reside in this District. (See id.)

As in Zobay, Defendants are large, multinational telecommunications companies that Plaintiffs allege conspired with known "fronts" for the Islamic Revolutionary Guard Corps ("IRGC") to provide funding, embargoed American technologies, and logistical support to the terrorist proxies supported by and aligned with the IRGC. (Id. ¶¶ 142-46, 631-32, 812-17, 900.) Plaintiffs allege that Defendants knowingly contracted with IRGC fronts and entered into

---

[2] The following facts are taken from Plaintiffs' Amended Complaint and are assumed true for purposes of this motion. I draw all reasonable inferences in Plaintiffs' favor. Vietnam Ass'n of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008).

agreements to aid the IRGC's "security" objectives, which Plaintiffs maintain is a euphemism for terrorist campaigns against Americans worldwide. (Id. ¶¶ 107-37, 318-19, 940.) Through those business arrangements, Plaintiffs allege that Defendants funneled money and dual-use technologies through the IRGC and Hezbollah to the terrorist groups who perpetrated the Attacks. (Id. ¶¶ 137-46, 272-73.)

ZTE Corp. is a Chinese corporation with a principal place of business in China. (Id. ¶ 57.) ZTE (USA) and ZTE (TX) are wholly owned subsidiaries of ZTE Corp., and both are United States corporations. (Id. ¶¶ 58-59.) Huawei Technologies Co. ("Huawei Co.") is a Chinese company with its principal place of business in China. (Id. ¶ 60.) The Huawei U.S. Defendants include Huawei Technologies USA Inc. ("Technologies USA"), Huawei Device USA Inc. ("Device USA"), and Futurewei Technologies, Inc. ("Futurewei"), wholly owned U.S. subsidiaries of Huawei Co. (Id. ¶¶ 61-63). Skycom Tech Co., Ltd. ("Skycom") has a principal place of business in Tehran, Iran, and at relevant times was wholly owned by Huawei Co. subsidiaries. (Id. ¶ 64.) Although ZTE Corp., Huawei Co., and Skycom are listed as defendants, the instant motion is brought by the ZTE and Huawei U.S. Defendants only.

Plaintiffs bring three causes of action, all for secondary liability pursuant to JASTA: Count One is an aiding-and-abetting claim based on the 64 attacks, (id. ¶¶ 1474-85); Count Two is a conspiracy claim, (id. ¶¶ 1486-1506); and Count Three is an aiding-and-abetting claim with a RICO predicate, (id. ¶¶ 1507-17).

## DISCUSSION

Both Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(2), for lack of personal jurisdiction, and 12(b)(6), for failure to state a claim. For the reasons that follow, Defendants' motions to dismiss are GRANTED.

## I.   Personal Jurisdiction

Because no individual plaintiffs reside in this District, Plaintiffs cannot rely on the ATA's nationwide service provision as the plaintiffs in Zobay did.  (See D.E. # 58 ("ZTE Reply") 20 n.18 ("Plaintiffs appear to concede that the ATA's nationwide service of process provision . . . does not confer jurisdiction here.").)  Instead, Plaintiffs focus their personal jurisdiction arguments on (1) New York's long-arm statute and (2) conspiracy jurisdiction.

### A.   Rule 4(k)(1)(a): New York's Long-Arm Statute

Federal Rule of Civil Procedure 4(k)(1)(a) permits jurisdiction over defendants who have been served and who are subject to long-arm jurisdiction in the forum state (here, New York).  See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 167-68 (2d Cir. 2013).  Under New York's long-arm statute, a court may exercise personal jurisdiction over any nonresident "who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state."  N.Y. C.P.L.R. § 302(a)(1).  A defendant transacts business within the state if he has "purposefully availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws."  United States v. Prevezon Holdings Ltd., 122 F. Supp. 3d 57, 76 (S.D.N.Y. 2015) (citation and internal quotation marks omitted).  "[T]he claim asserted" must also "arise from that business activity."  Licci, 732 F.3d at 168 (citation omitted).

### 1. ZTE U.S. Defendants[3]

Plaintiffs allege that ZTE Corp. agreed to provide U.S.-origin goods and services to the Telecommunications Company of Iran ("TCI"), in violation of U.S. sanctions, while knowing that

---

[3] The parties appear to agree that the ZTE U.S. Defendants are not subject to general personal jurisdiction in New York.  (See D.E. # 57 ("ZTE Br.") 44.)  As the Second Circuit has held, registering to do business in New York is insufficient to establish general personal jurisdiction over ZTE USA in the Eastern District of New York.  See Chufen Chen v. Dunkin' Brands, Inc., 954 F.3d 492, 496 (2d Cir. 2020).

TCI was a front for the IRGC's terrorism. (AC ¶ 512.) From 2010 to 2016, ZTE "secured contracts worth hundreds of millions of dollars" and exported over 20 million U.S.-origin items to the IRGC. (Id. ¶¶ 516, 520.) Plaintiffs further allege that ZTE's U.S. subsidiaries were involved; ZTE USA sourced U.S. technology for ZTE Corp. (and therefore for the IRGC), and ZTE TX did so after its formation in 2013. (Id. ¶ 526.)

Plaintiffs contend that ZTE transacts business in New York by: (1) selling cell phones and telecommunications equipment; (2) maintaining New York financial accounts that, on information and belief, ZTE utilized in furtherance of their scheme; and (3) entering into partnerships in New York to source materials for their cell phones, such as rugged glass fronts. (See D.E. # 60 ("ZTE Opp'n") 47.) None of these theories is availing.

The allegations relating to New York business are attributed to "ZTE," which Plaintiffs define to include the U.S. subsidiaries, but as ZTE points out, the question is whether that conduct is plausibly attributed to ZTE USA and ZTE TX. Plaintiffs suggest it is because the U.S. subsidiaries are the only ZTE entities registered to do business in New York. (AC ¶ 67.) Moreover, ZTE USA's website confirms that ZTE phones use rugged "Gorilla Glass" made by New York-based company Corning. (ZTE Opp'n 47.) Therefore, according to Plaintiffs, it is plausible to infer that the U.S. subsidiaries contracted with Corning to supply rugged glass for the cell phones that they then provided to their parent, who provided the illegally exported goods to IRGC fronts. (See id.)

To begin with, several of ZTE's key allegations are made only upon information and belief, which means "the plaintiff must support them by offering facts upon which that belief is founded." Brodie v. Green Spot Foods, LLC, 503 F. Supp. 3d 1, 13 (S.D.N.Y. 2020). As to at least the allegation that ZTE USA and TX maintained New York financial accounts that were used in

furtherance of ZTE Corp.'s sanctions-evasion scheme, Plaintiffs provide no specific factual support, asserting only that it is plausible that companies having business relationship with a New York company would maintain New York bank accounts. (See ZTE Opp'n 47-48.)

But all ZTE's purported New York contacts suffer from a more fundamental defect. To satisfy New York's long-arm statute, Plaintiffs must show their ATA claim "arise[s] from that business activity." Licci, 732 F.3d at 168. Plaintiffs' theory is that the U.S. subsidiaries assisted ZTE Corp., their parent corporation, in its sanctions-evasion scheme by sourcing U.S.-origin goods—like smartphones—for ZTE Corp. to provide to TCI. If Plaintiffs have plausibly pleaded that connection, then the alleged contacts related to sourcing material for cell phones would be connected to their claim. If, however, Plaintiffs do not adequately plead a connection between the U.S. subsidiaries and ZTE Corp.'s sanctions-evasion scheme, then the New York contacts—even if they were adequately pleaded—cannot be considered suit-related.

Plaintiffs have not alleged facts sufficient to raise the inference that ZTE USA and TX were involved in ZTE Corp.'s sanctions-evasion scheme. "[A] plaintiff is required to establish personal jurisdiction separately over each defendant." In re Aegean Marine Petro. Network, Inc. Sec. Litig., 529 F. Supp. 3d 111, 135 (S.D.N.Y. 2021). "Allegations in the form of a group pleading are insufficient, even for affiliated corporate entities." In re SSA Bonds Antitrust Litig., 420 F. Supp. 3d 219, 233 (S.D.N.Y. 2019).

As in Zobay, the OFAC Settlement Agreement and accompanying documents undermine Plaintiffs' argument that ZTE USA and TX were implicated in ZTE Corp.'s scheme. (See Zobay M&O at 19-23.) Neither subsidiary was a signatory to the Agreement, and the accompanying documents were explicit in identifying the (other) entities involved in ZTE Corp.'s violations. (See

D.E. # 57-3 ("Factual Resume"); D.E. # 57-4 ("Guilty Plea Agreement").)[4] For example, the Factual Resume details ZTE Corp.'s scheme to illegally cause the export of goods from the United States to Iran, and names ZTE Corp.'s co-conspirators. (Factual Resume ¶ 3.) The only named co-conspirators that are ZTE subsidiaries or affiliates are ZTE Parsian, based in Tehran, and ZTE Kangxun Telecommunications Ltd. (Id. ¶¶ 3-4, 32-33, 45, 50.) The Factual Resume also names the co-conspirator companies that acted as vehicles for ZTE Corp. in hiding its shipments of U.S. origin items to Iran: Beijing 8 Star Co. International ("8S") and Chinese Company A ("CCA"). (Id. ¶¶ 5-6.) The Factual Resume describes 8S, and later CCA, as "isolation companies" through which ZTE Corp. purchased the embargoed equipment from suppliers to conceal ZTE Corp.'s role. (Id. ¶ 24.) ZTE USA, on the other hand, is mentioned only as ZTE Corp.'s United States subsidiary and is not described as playing a role in the export control violations. (Id. ¶ 4.) At most, the Factual Resume points out that U.S. government agencies served ZTE USA with administrative and criminal subpoenas when Reuters reported in March 2012 that ZTE Corp. was selling systems with U.S.-origin component parts to Iran—in other words, when those agencies began their investigations into ZTE Corp. (Id. ¶ 43.) The FBI sought documents and records related to all sales to Iran and conducted searches of various ZTE USA offices. (Id. ¶ 57.) From this, Plaintiffs extrapolate that "the evidence used to prosecute ZTE was acquired via subpoenas, seizures, and summonses to Defendant ZTE USA." (ZTE Opp'n 2.) Plaintiffs also point out that the Guilty Plea Agreement allows the United States to seize assets of ZTE USA if ZTE Corp. does not pay its forfeiture money judgment. (Id. at 2-3 (citing Guilty Plea Agreement § 13).)

---

[4] In considering a Rule 12(b)(2) motion, I may consider materials beyond the pleadings. Cooke v. United States, 918 F.3d 77, 80 (2d Cir. 2019). The Factual Resume is a stipulation of facts that was agreed to by ZTE Corp. and the U.S. Attorney's Office for the Northern District of Texas and could be used in support of ZTE Corp.'s guilty plea. (See Factual Resume 1.)

Although I make all reasonable inferences in Plaintiffs' favor, I need not draw argumentative inferences, Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994), and the allegations in the complaint are presumed true only "to the extent they are uncontroverted by the defendant's affidavits," MacDermid, Inc. v. Deiter, 702 F.3d 725, 727 (2d Cir. 2012) (citation omitted). Here, although Plaintiffs point to various references to ZTE USA in the underlying trade sanctions documents, none of those documents ultimately implicate ZTE USA in wrongdoing. That the U.S. government used ZTE USA, its U.S. subsidiary, as a vehicle to investigate ZTE Corp.'s criminal activity makes sense. And the fact that ZTE USA was searched and investigated but the Factual Resume—the culmination of that investigation—does not assert that ZTE USA aided ZTE Corp.'s sanctions-evasion scheme makes Plaintiffs' allegations implausible. The seizure-of-assets provision also does not support Plaintiffs' contentions; ZTE Corp. is a foreign company, and Plaintiffs do not challenge ZTE's assertion that it is most straightforward for the government to target U.S.-based assets. Nor does backing up ZTE Corp.'s money judgment imply that the subsidiary was involved in the underlying crimes.

Moreover, the Factual Resume controverts Plaintiffs' allegations that ZTE USA served as an agent for ZTE Corp. in sourcing embargoed U.S. goods because the government's investigation revealed that two other companies, 8S and CCA, played that role. Although it is not inconceivable that ZTE USA also sourced goods for ZTE Corp., the otherwise detailed Factual Resume omits any mention of them doing so. The document also makes clear that the purpose of such "isolation companies" would be to distance ZTE Corp. from the transaction, and a parent utilizing its U.S. subsidiaries as instruments for illegality would not do so. See Berdeaux v. OneCoin Ltd., 561 F. Supp. 3d 379, 397 (S.D.N.Y. 2021) (no personal jurisdiction where the plaintiffs "attempt[ed] to

8

extend an allegation levied against one particular Defendant to the remaining Defendants in the group" through "speculative and conclusory allegations").

ZTE TX is not mentioned anywhere in the OFAC Settlement Agreement or accompanying documents. Plaintiffs assert in conclusory fashion that even though ZTE TX was not formed until at least 2013, the entity participated in the scheme after its formation. (AC ¶ 518.) The documents belie this contention, and the allegations are unsupported. Plaintiffs appear to maintain that because ZTE TX was founded in 2013, after the FBI began investigating the sanctions-evasion scheme and a ZTE USA whistleblower revealed information about the scheme, it is plausible to infer that ZTE TX was created for the purpose of continuing ZTE USA's role after the whistleblower was "formal[ly] sidelin[ed]." (ZTE Opp'n 20-21.) But "[p]leading a fact that is 'merely consistent with a defendant's liability' does not satisfy the plausibility standard." Abu Dhabi Com. Bank v. Morgan Stanley & Co., Inc., 651 F. Supp. 2d 155, 170 (S.D.N.Y. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). Accordingly, the allegations of misconduct in the OFAC Settlement Agreement are not properly attributed to either ZTE USA or ZTE TX.

Nor do Plaintiffs' other allegations concerning ZTE USA's former general counsel, Ashley Yablon, suggest a different conclusion. (See AC ¶ 538.) Even assuming Yablon did instruct ZTE USA employees not to destroy evidence about the subsidiary's role, without additional supporting facts and in light of ZTE's controverting evidence, Plaintiffs fail to meet their burden to make a prima facie showing. ZTE's allegations related to Yablon also appear inconsistent with other portions of the Amended Complaint, which asserts that the U.S. subsidiaries concealed the scheme. (See ZTE Opp'n 19-20.) At most, Plaintiffs' allegations are consistent with ZTE USA's involvement, but that is not enough to plausibly plead such involvement, and without that link,

Plaintiffs cannot plead the requisite minimum suit-related U.S. contacts.  See Abu Dhabi Com. Bank, 651 F. Supp. 2d at 170.[5]

Finally, Plaintiffs advance a new argument that ZTE as an enterprise provided American technology, including smart phones, to the Taliban and the Haqqani Network as "free goods" acting as protection payments. (ZTE Opp'n 21.)  Plaintiffs argue these allegations are plausible because terrorists prefer American-made smartphones and the U.S. subsidiaries were involved in the sanctions-evasion scheme.  (Id.)  Because this argument also relies on ZTE USA and TX's connection to the scheme for which ZTE Corp. pleaded guilty, it fails for the reasons stated above. It also fails for the independent reason that Plaintiffs do not plausibly allege that even ZTE Corp. provided free "American-made cell phones" as protection payments to the Taliban.  All allegations purporting to raise such an inference are either conclusory or speculative.  (See AC ¶¶ 7, 16, 20(iv), 95 n.20, 559-60, 574-81, 787, 789-93, 976, 1479, 1494.)  Accordingly, Plaintiffs have not shown suit-related contacts and therefore cannot rely on New York's long-arm statute to establish personal jurisdiction over the ZTE U.S. Defendants.

### 2. Huawei U.S. Defendants

Plaintiffs allege that Huawei Co. "secured contracts worth hundreds of millions of dollars to provide telecommunications and network infrastructure equipment and related services" to Iranian companies like TCI and Irancell, even though Huawei Co. allegedly knew that its counterparties were IRGC fronts, operatives, or agents.  (Id. ¶ 635.)  Plaintiffs allege that Huawei Co.'s scheme to obtain U.S.-origin goods and evade export controls to provide telecommunications

---

[5] Plaintiffs also note that ZTE Corp. entered into contracts with U.S. tech giants Broadcom and Qualcomm "through and by ZTE USA" to obtain the technology for export to Iran. (AC ¶ 526(xi).)  Although the contractual relationships are more specific, the connection to ZTE USA is entirely conclusory.  And indeed, as ZTE points out, the Factual Resume found that ZTE Corp. itself engaged with U.S. suppliers to obtain the goods at issue.  (See Factual Resume ¶ 27.)

technology and resources to the IRGC was "company-wide" and involved the Huawei U.S. Defendants after each of their respective formations. (Id. ¶ 636.)

Huawei contends that—absent improper group pleading—Plaintiffs do not allege business activity in New York on behalf of the U.S. subsidiaries. (Huawei Br. 47.) Allegations "refer[ring] to affiliated defendants by a conclusory collective name" cannot support personal jurisdiction and must be disregarded. See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A., No. 16-cv-5263 (AKH), 2017 WL 3600425, at *6 (S.D.N.Y. Aug. 18, 2017). Several jurisdictional allegations in the Amended Complaint improperly lump together all Huawei defendants. For example, Plaintiffs allege that "Huawei does business in New York, including by selling cell phones and telecommunications equipment," and it "maintains accounts with financial institutions, located in New York, which, on information and belief, Huawei utilized in furtherance of their scheme alleged herein." (AC ¶ 69.) Other allegations upon which Plaintiffs rely attribute the relevant conduct to Huawei Co. or Skycom, (id. ¶ 666-68), or else are vague and conclusory, (see id. ¶ 668 ("Huawei used a U.S. subsidiary of a global financial institution . . . to process U.S.-dollar clearing transactions . . . . Some of these transactions passed through this District.")); Singer v. Bank of Palestine, No. 19-cv-6 (ENV) (RML), 2021 WL 4205176, at *4-5 (E.D.N.Y. Apr. 30, 2021) (dismissing for lack of personal jurisdiction for failure to "identif[y] a single transfer, dollar amount, transfer date, or the parties to any alleged [] transfers through a New York banking institution").

The allegations that are more specific to the U.S. subsidiaries rely on the conduct underlying the federal grand jury indictment filed against Huawei Co., Device USA, Futurewei, and Skycom. See Third Superseding Indictment, United States v. Huawei Techs. Co., No. 18-cr-457 (E.D.N.Y. Feb. 13, 2020), D.E. # 126. But to begin with, Huawei Technologies is not

11

implicated in the indictment, see id. at 33-49, and the allegations concerning this subsidiary are conclusory, devoid of specific facts, (see, e.g., AC ¶¶ 635, 662-63), and do not mention New York contacts. In their opposition, Plaintiffs note that Huawei's primary witness in a congressional investigation into the national security threat posed by Huawei "was employed by both Huawei Co. and Huawei Technologies USA." See Third Superseding Indictment ¶ 62. But Plaintiffs do not explain how the hearing relates to the conduct underlying Plaintiffs' ATA claims or how overlap between different corporate entities' personnel confers personal jurisdiction. See Starr v. Sony BMG Music Ent., 592 F.3d 314, 321 (2d Cir. 2010) ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007))). Accordingly, Plaintiffs' claims against Huawei Technologies are dismissed for lack of personal jurisdiction.

As to Device USA and Futurewei, Plaintiffs contend that the subsidiaries are charged with "a pattern of racketeering activity" that occurred "within the Eastern District of New York" and involved wire fraud, financial institution fraud, theft of trade secrets, money laundering, and obstruction of justice. Third Superseding Indictment ¶¶ 92-93. Device USA is specifically charged with conspiring to obstruct a grand jury investigation in this District, via conduct occurring "within the Eastern District of New York." Id. ¶ 128. Huawei contends that the mere fact of an indictment cannot support personal jurisdiction in an unrelated civil case, and that no factual allegations in the indictment would suffice to meet the standard under N.Y. C.P.L.R. § 302. (Huawei Br. 47.) Although an indictment on its own might not suffice, where a criminal case arises out of related conduct, it can support the plausibility of a plaintiff's jurisdictional allegations. See In re Tether & Bitfinex Crypto Asset Litig., 576 F. Supp. 3d 55, 89 n.26 (S.D.N.Y. 2021) (citing indictment of defendant "in a criminal case arising out of related conduct as additional

12

support for [the defendant's] illicit use of correspondent banking services in New York" for personal jurisdiction purposes).

The question, then, is whether the conduct underlying the indictment is sufficiently related to Plaintiffs' argument that the U.S. subsidiaries engaged in suit-related conduct in New York. Plaintiffs allege that Huawei Co. did "significant business" with MCI and Irancell, (AC ¶ 647), and because those companies required U.S.-origin technology subject to export controls, Huawei "set up subsidiaries disguised as unrelated Iranian or Syrian 'partners' and use[d] those subsidiaries to hide Huawei's business with [the IRGC]," (id. ¶ 640). Skycom, based in Iran, was one of these "partners," and Huawei went to great lengths to conceal its ownership and control of Skycom. (Id. ¶¶ 640-41.) Huawei internal company records from 2010 reflect that Huawei shipped Hewlett-Packard equipment (U.S.-origin technology) to MCI via Skycom. (Id. ¶ 650.) Plaintiffs theorize that in addition to Skycom, Huawei Co. reached into the United States to obtain embargoed technology for TCI, MCI, and Irancell "through various U.S. agents, including but not limited to Huawei Device USA, Huawei [Technologies] USA, and Futurewei." (Id. ¶ 744.) Plaintiffs support these allegations through the EDNY indictment.

But as to Device USA and Futurewei, most of the allegations based on the indictment cannot be connected to Huawei Co. and Skycom's sanctions-evasion scheme. Plaintiffs allege that Device USA and Futurewei misappropriated and/or reverse engineered U.S.-origin equipment and technology, and suggest that either (1) technology from the misappropriation scheme or (2) profits from it constituted substantial assistance to the IRGC (through Irancell, TCI, and/or MCI). (D.E. # 61 ("Huawei Opp'n") 19-20.) The indictment accuses Huawei Co., Device USA, and Futurewei of stealing intellectual property from competitors, thereby allowing these defendants to "grow [Huawei's] worldwide business" and save on research and development costs. Third Superseding

13

Indictment ¶ 8. Plaintiffs suggest that because these defendants "agreed to use the proceeds derived from the theft of intellectual property to establish and operate . . . [Huawei's business] in the United States and abroad," the funding must have been sent, via Huawei's Iranian business partners, to the IRGC. Id. ¶ 16; (AC ¶ 653 ("To further Huawei's global business interests, including its desire to export U.S.-origin equipment or technology to MCI and/or MTN Irancell, Huawei, including its U.S. subsidiaries . . . misappropriated and/or reverse-engineered US-origin equipment and technology.").) But a plausibly stated claim may not "require an interlocking chain of inferences built on inferences." Khapesi v. City of New York, No. 13-cv-4391 (KBF), 2014 WL 2605342, at *8 (S.D.N.Y. June 10, 2014). There is also no indication from the indictment that the IP-misappropriation scheme was connected to and subsumed within the separate Skycom scheme to ship Huawei goods and services to users in sanctioned countries like Iran. Third Superseding Indictment ¶¶ 68-79. That procurement scheme is instead attributed to Huawei Co., through "local affiliates in the sanctioned countries, such as Skycom in Iran." See id. ¶ 68. Accordingly, Plaintiffs' allegations concerning the IP-misappropriation scheme are insufficient to show suit-related contacts to Plaintiffs' ATA claim.[6]

As in Zobay, Plaintiffs do arguably allege specific involvement in the scheme on behalf of Device USA and Futurewei in the context of those defendants' attempts to conceal Huawei Co.'s sanctions-evasion scheme. The indictment accuses the two companies of concealing "other criminal activity, including the nature and extent of business in high-risk jurisdictions such as Iran," through material misrepresentations to U.S. governmental bodies from whom Huawei "sought regulatory authorization that would help grow [their] U.S.-based business." Third

---

[6] To the extent Plaintiffs argue, as they do with respect to ZTE, that the Huawei U.S. subsidiaries exported U.S.-origin items to be provided by Huawei Co. to the Taliban as "free goods," those allegations are insufficient to suggest New York contacts. Plaintiffs' "free goods" theory is explicitly tied to their allegations describing Huawei's sanctions-evasion scheme, and those contacts are properly attributed to Skycom only.

Superseding Indictment ¶ 17. According to the indictment, those misrepresentations were made in service of the general scheme to grow Huawei's worldwide business and avoid regulatory interference. Id. The indictment also alleges that when Huawei Co. and Device USA became aware of the U.S. government's criminal investigation, they "made efforts to move witnesses with knowledge about Huawei's Iran-based business to the PRC . . . and to destroy and conceal evidence in the United States of Huawei's Iran-based business." Id. ¶ 87. Huawei Co. and Device USA were charged with one count of conspiracy to obstruct justice. Id. ¶ 127. The Huawei U.S. Defendants respond that the obstruction charge in the indictment does not concern terrorism, (D.E. # 55 ("Huawei Reply") 3 n.3), but the paragraphs to which the indictment cites for that charge include the allegations describing the Skycom procurement scheme, which is the basis of Plaintiffs' aiding-and-abetting claim. The obstruction charge against Device USA also specifically notes that the subsidiary, along with its parent, conspired to obstruct "a Federal Grand Jury investigation in the Eastern District of New York." Third Superseding Indictment ¶ 128. Accordingly, Plaintiffs plausibly plead that at least Device USA and Futurewei purposefully directed its activities at New York and that their ATA claims arise from that activity.

Turning to due process and reasonableness, although New York's long-arm statute and constitutional due process are not coextensive, the Second Circuit has stated:

> It would be unusual, indeed, if a defendant transacted business in New York and the claim asserted arose from that business activity. . . and yet, in connection with the same transaction of business, the defendant cannot be found to have "purposefully availed itself of the privilege of doing business in the forum and [to have been able to] foresee being haled into court there."

Licci, 732 F.3d at 170 (quoting Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 127 (2d Cir. 2002)). The Huawei U.S. Defendants have made no showing that this

represents such a rare case. Accordingly, Device USA and Futurewei's motion to dismiss for lack of personal jurisdiction is denied.

### B. Conspiracy Jurisdiction

When asserting that personal jurisdiction exists based on a conspiracy, a "plaintiff must allege that: (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts . . . to subject that co-conspirator to jurisdiction in that state." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 87 (2d Cir. 2018).

Plaintiffs cannot rely on conspiracy jurisdiction because the Amended Complaint does not adequately allege the existence of a conspiracy. Section 2333(d)(2) permits claims for secondary liability "as to any person . . . who conspires with the person who committed . . . an act of international terrorism" as set forth in § 2333(a). The scope of the alleged conspiracy is broad: Plaintiffs allege that from 2001 until the end of the war in Afghanistan, the IRGC led a conspiracy involving Hezbollah and Sunni and Shiite terrorist proxy groups in a "transnational alliance with all the same functionalities as NATO to successfully prosecute a global terror campaign against Americans." (AC ¶¶ 107, 157-59.) Plaintiffs allege that the conspirators' common goal "was to finance, arm, and logistically support Hezbollah, the Qods Force," and the IRGC in its campaign to "force the United States to withdraw from Afghanistan, Iraq, and the rest of the Middle East." (Id. ¶¶ 1490-92.)

As with aiding-and-abetting liability, the D.C. Circuit's decision in Halberstam provides "the proper legal framework" for assessing conspiracy liability under § 2333(d). Pub. L. No. 144-222, § 2(a)(5), 130 Stat. at 852. To plead a civil conspiracy claim, a plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury

16

caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." Halberstam, 705 F.2d 472, 477 (D.C. Cir. 1983).

Plaintiffs' conspiracy claim fails because they have not adequately alleged an agreement in furtherance of a common scheme. Pursuant to § 2333(d)(2), a plaintiff need not allege that the defendants conspired directly with the person who committed, planned, or authorized a terrorist attack. Freeman v. HSBC Holdings, PLC, 57 F.4th 66, 77-79 (2d Cir. 2023), cert. pending. As in Zobay, however, Plaintiffs' allegations are insufficient to plausibly suggest that either set of Defendants reached an agreement with either intermediary—the Iranian shareholders or the IRGC—to carry out a common scheme to commit an act of international terrorism. See id. at 75, 79-80; Bernhardt v. Islamic Republic of Iran, No. CV 18-2739 (TJK), 2020 WL 6743066, at *7 (D.D.C. Nov. 16, 2020), aff'd, 47 F.4th 856 (D.C. Cir. 2022) ("In short, 'to be subject to secondary liability under JASTA on the basis of a conspiracy, a defendant must have conspired to commit an act of international terrorism.'") (quoting O'Sullivan v. Deutsche Bank AG, No. 17 CV 8709-LTS-GWG, 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019)). "While courts may 'infer an agreement from indirect evidence in most civil conspiracy cases,' a complaint must nonetheless allege that the coconspirators were 'pursuing the same object.'" Id. (quoting Halberstam, 705 F.2d at 486-87); see also United States v. Parker, 554 F.3d 230, 234 (2d Cir. 2009) ("[U]nless at least two persons have a shared purpose or stake in the promotion of an illegal objective, there is no conspiracy.").

Plaintiffs do not plausibly allege that Defendants and the terrorist groups who perpetrated the Attacks shared any "common intent." Halberstam, 705 F.2d at 480.[7] The Amended Complaint

---

[7] Plaintiffs allege in conclusory fashion that Defendants "supported the object of the Conspiracy because it furthered the hostile security strategy of the Chinese Communist Party." (Id. ¶ 1493.) However, this allegation is

alleges as a common objective "expelling the United States from the Middle East," (AC ¶ 109),

but the allegations do not support that Defendants joined in that goal. It is therefore not plausible

to infer that "the terrorist attacks that killed or injured the service members were in furtherance of

the conspiracy" to which Defendants allegedly agreed. See Freeman, 57 F.4th at 80-81; see also

Bernhardt, 47 F.4th at 873 (holding that the plaintiffs' "conspiracy claim [against HSBC] is

inadequate" because "[t]he complaint states that HSBC was trying to make substantial profits by

evading sanctions, whereas al-Qaeda sought to terrorize the U.S. into retreating from the world

stage" (internal quotation marks omitted)). Because Plaintiffs have not plausibly pleaded the

existence of an agreement, they cannot plead conspiracy or rely on conspiracy jurisdiction. See

Charles Schwab Corp., 883 F.3d at 87.

### C. Jurisdictional Discovery

In the alternative, Plaintiffs request jurisdictional discovery. "District courts have broad

discretion to decide whether to allow jurisdictional discovery and, if so to what extent." In re MS

Angeln GmbH & Co. KG, No. 10-cv-4820, 2012 WL 1080300, at *7 (S.D.N.Y. Mar. 29, 2012).

"If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction[al] discovery is

appropriate even in the absence of a prima facie showing as to the existence of jurisdiction."

Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004). Plaintiffs

here do not explicitly describe the discovery they seek; instead, Plaintiffs assert that discovery will

confirm that it was ZTE USA which contracted with New York-based Gorilla Glass manufacturer

Corning and had relationships with financial institutions. But as explained earlier, even if it did,

Plaintiffs would still need to satisfy relatedness. And courts will reject overly broad requests for

---

insufficiently specific as to the U.S. defendants and is contradicted by other, more specific allegations "suggesting that money—and not extremism—was the motivation behind defendants' actions." Bernhardt v. Islamic Republic of Iran, No. 18-2739, 2020 WL 6743066, at *6 (D.D.C. Nov. 16, 2020), aff'd, 47 F.4th 856 (D.C. Cir. 2022).

jurisdictional discovery that would be likely to go as much to the heart of the plaintiff's claims on the merits. See Zurich Am. Life Ins. Co. v. Nagel, No. 20-cv-11091 (JSR), 2021 WL 5225947, at *9 (S.D.N.Y. Nov. 10, 2021) (denying jurisdictional discovery where proposed requests were "not narrow; they instead appear[ed] to be an attempt to conduct discovery that goes as much to the merits as it does to jurisdiction"). Accordingly, Plaintiffs' request for jurisdictional discovery is denied and their claims against the ZTE U.S. Defendants are dismissed for lack of personal jurisdiction.

## II.   Anti-Terrorism Act Liability

I now turn to whether Plaintiffs have plausibly stated ATA claims against Device USA and Futurewei. For the following reasons, these subsidiaries' motion to dismiss is GRANTED.

### A.   Count One: Aiding-and-Abetting Liability (Attack Predicate)

For the reasons articulated in Zobay, Plaintiffs' concealment-based allegations are insufficient to plead knowing and substantial assistance under the framework established by Twitter v. Taamneh, 598 U.S. 471 (2023). See Zobay M&O at 66-71. In sum, although concealment of a criminal scheme would undoubtedly be useful to a terrorist enterprise, focusing—as I must—on whether Plaintiffs have plausibly pleaded "culpable participation through intentional aid that substantially furthered the tort," I conclude that they have not. Taamneh, 598 U.S. at 506. My conclusion is bolstered by the degree of attenuation between the U.S. defendants and the specific attacks (including, importantly, the subsidiaries' relationship to Huawei Co.'s scheme in the first place). See id. at 500, 506.

19

### B. Count Two: Conspiracy

For the reasons stated in Part I.B, Plaintiffs have not plausibly alleged the existence of a conspiratorial agreement, a necessary element to establishing civil conspiracy. See Charles Schwab Corp., 883 F.3d at 87.

### C. Count Three: Aiding-and-Abetting Claim (RICO Predicate)

Plaintiffs' third cause of action seeks to hold Defendants liable for aiding and abetting on a different theory: RICO. To state any aiding-and-abetting claim under the ATA, a plaintiff must allege that he was injured by an "act of international terrorism." 18 U.S.C. § 2333(d)(2). Rather than alleging that Defendants aided and abetted the Attacks through which Plaintiffs or their family members were injured, as they did in Count One, Plaintiffs claim that Defendants assisted an "IRGC-Taliban-al-Qaeda Campaign," i.e., a multiyear criminal enterprise that violated the federal racketeering statute (RICO). (AC ¶¶ 1510-17.) For the reasons articulated in Zobay, Count Three is dismissed because a RICO predicate is not a viable theory of liability under the ATA. See Zobay M&O at 75-76.

Finding that a RICO "campaign" of terrorism constitutes an "act" of international terrorism would be inconsistent with the statutory text and with the weight of authority. See Wildman v. Deutsche Bank Aktiengesellschaft, No. 21-cv-4400 (HG) (RML), 2022 WL 17993076, at *27 (E.D.N.Y. Dec. 29, 2022) (finding that "Plaintiffs' RICO claim is not a valid theory of liability under the ATA"); Atchley v. AstraZeneca UK Ltd., 474 F. Supp. 3d 194, 212 (D.D.C. 2020), rev'd on other grounds, 22 F.4th 204 (D.C. Cir. 2022); Cabrera, 2021 WL 3508091, at *26. Moreover, such an interpretation would undermine the ATA's restriction of liability to attacks "committed,

20

planned, or authorized" by a specific kind of designated entity—an FTO. Accordingly, Count

Three is dismissed.[8]

## CONCLUSION

For these reasons, Defendants' motions to dismiss are GRANTED.

SO ORDERED.

Dated: September 28, 2023
Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

---

[8] Because I conclude that all Plaintiffs' claims against both sets of Defendants should be dismissed, I need not address Defendants' additional arguments for dismissal.